[No. 3188. May 29, 1929.]

LA LUZ COMMUNITY DITCH CO. et al v. TOWN OF ALAMOGORDO.

[279 Pac. 72.]

J. L. Lawson, of Alamogordo, and Edward C. Wade, Jr., of El Paso, Tex., for appellant.

W. A. Hawkins, of La Luz, and Harry H. McElroy, of El Paso, Tex., for appellees.

## OPINION OF THE COURT

BICKLEY, C. J. The purpose of this suit was to secure a declaration of the measure of the water rights of plaintiffs, as theretofore judicially established, in terms of standard measurement adopted by the laws of this state for the measurement of waters, and that the defendant be restrained from diverting the same to its own use or in any way diminishing the same and for other relief. The defendant answered, pleading denials and former adjudication. The trial court awarded the relief prayed for by plaintiffs, and defendant has appealed.

The water rights of the appellant and appellees were

originally acquired by virtue of appropriations and use of waters arising from La Luz and Fresnal creeks, and diverted from La Luz creek. Originally, the water so appropriated was partly used within the village of La Luz and partly outside of the village. Prior to the 16th day of July, 1892, a dispute arose between the water users within the village (appellees' predecessors) and those without said village, concerning the division and use of such waters, and on that date an agreement was made and reduced to writing which was intended to define the amount of water to which the water users within the village of La Luz were entitled. Within a short time after this agreement was made, these water rights were again in dispute between the water users within and without said village, and in 1895 litigation arose concerning the division of such waters. While this litigation was pending, the Alamogordo Improvement Company from which appellant, town of Alamogordo, acquired its water rights, purchased all the water rights belonging to the water users outside of the village, as well as a small part of the waters owned by those within the village of La Luz, desiring and intending to carry the water so acquired to the town of Alamogordo for town purposes. The litigation which had so arisen between such water users had not been tried and the parties in interest, having agreed upon the terms of a decree, made and filed in the cause a written stipulation. In this stipulation, the quantity of water to be given to the water users of the village of La Luz was described as:

"The 36 inches of water mentioned in the agreement attached as an exhibit to, and referred to in the original bill of complaint herein, and set out in said bill."

This is the agreement heretofore referred to. In pursuance of that agreement, the final decree in the cause, and referred to during the trial as the decree of 1898, was entered.

The only description of the quantity of water belonging to the water users of the village of La Luz as contained in that decree is as follows (italics ours):

"That said 54 acres of land (referring to the land included in the then village of La Luz) shall be entitled to a flow from the

La Luz and Fresnal cañons acequia whenever and as long as any waters flow through said ditch a permanent stream of thirty-six inches of water which shall perpetually run, day and night, through the two present community ditches belonging to the said town of La Luz, *which said quantity of water shall fill an opening or gate six inches in length and three inches in width, through each of said ditches, making eighteen square inches of water through each ditch;* this right of water shall be, and is hereby decreed to be perpetual and free from fatigue, or common work, on the said La Luz ditch from the point where water is taken from the La Luz ditch and put into the two town ditches up to the head of said La Luz ditch.".

Referring to this decree of 1898, a witness, Vernon L. Sullivan, an irrigation and hydraulic engineer of wide experience, formerly territorial engineer of New Mexico, after stating the character of his examination of the decree, testified:

"The decree in itself in its statement of 36 inches doesn't definitely state an amount of running water. It supplies what that amount is in the language that it shall be a quantity of water which will fill an opening or gate six inches in length and three inches in width through each of the said ditches, making a total of eighteen square inches through each ditch. This amount doesn't definitely explain the exact amount of water. * * *"

The witness then says that he considered the agreement of 1892 mentioned in said stipulation, and finding a provision therein, that to the inhabitants of La Luz

"There shall permanently run, in the day and night; a quantity of water for the town for two acequias, which quantity of water shall fill an opening or gate six inches long and 3 inches wide for each of the acequias, making a quantity of 18 square inches for each acequia without pressure." (According to one translation, the phrase was "without any pressure.")

The witness next considered the pleadings in the cause leading up to the decree of 1898. The complaint alleged the making and entering into the contract of July 16, 1892, and alleged that the parties thereby recognized and bound themselves to respect the rights of the complainant and the inhabitants of said town

"to the absolute property in and perpetual use of thirty-six inches of water, flowing *with the natural force of the current* (italics ours), through two ditches taken from the main ditch carrying the waters of the said streams hereinbefore mentioned, said two ditches heading in said main ditch at a point east of the said town of La Luz, and near the line between the southwest quarter of section twenty-five, and the southeast quarter of section twenty-six, in township fifteen south, range ten east."

An answer was filed on behalf of defendants, wherein it was admitted that by said agreement defendants bound themselves to respect the rights of the plaintiffs "to the absolute property in a perpetual stream of 36 inches of water *flowing with the natural force of the current,*" etc.

There was also a cross-bill filed in which the cross-complainants admitted substantially the same thing.

The witness Sullivan stated that, after considering the decree, stipulation, contract, and pleadings, still,

"in order to determine what the court meant by 36 inches it is necessary to obtain as near as possible the conditions and customs that were in vogue at the time this agreement was made, leading up to the time of the agreement, (referring to the agreement of 1892) because without knowing what these conditions were, there could be no definite amount of water from the wording of the decree."

There was other testimony of engineers, and others to the same effect, and the court found that the description of the water rights as set forth in the said decree of 1898 "is ambiguous, indefinite and uncertain"; and

"That said decree of 1898 was based upon a stipulation referring to a contract made between the parties in interest, which contract and the effect thereof, are set forth and alleged in the pleadings of parties to said former action, * * * but the court finds that the description of said water rights contained in the said decree of 1898, as the same is susceptible of interpretation in the light of said stipulation, agreement, and pleadings, is, nevertheless, indefinite and uncertain, for the reason that the description of said water rights and the division thereof between the said parties, depends under the terms of said decree upon certain physical factors employed in the division of said waters, which were so indefinitely described that the amount of water delivered under such conditions cannot now be accurately determined."

In attempting to divide the water in accordance with the agreement of 1892, a crude mechanical device referred to as a "wooden flume or box with gates in it" was used to divide the water. That flume, or device, was not automatic, and the flow of water there through was influenced by the fall of such flume, which conformed to the lay of the land, and also by the volume of water in the main ditch which supplied water thereto, and also by the manipulation of the headgate. Under these varying factors, different amounts would pass through such flumes and gates. This device continued in use until the decree of

1898 was made, but the same was unsatisfactory, and disputes as to the division of water effected thereby arose from time to time while it was in use.

After the decree of 1898 was made, the use of this device for measuring the water out to the village of La Luz was abandoned, and, in order to secure suitable location and grades to carry the water which had been acquired by the Alamogordo Improvement Company to the town of Alamogordo, the place of division of the water between the Alamogordo Improvement Company and the water users of La Luz was changed by such improvement company with the consent of the La Luz community ditch water users, to a point some distance east of the place where the water had been divided at the time said decree of 1898 was signed. Afterwards, the devices and means employed for dividing said waters between the users thereof were changed by mutual consent from time to time. The court found that, in pursuance of the terms and obligations of the said decree of 1898, the defendant, the town of Alamogordo, and its predecessors in title, had at all times performed the duty of providing and maintaining the necessary devices for the division of said water, and making the division thereof and maintaining the said ditch between the point of diversion on the creek and the said point of division of the waters.

The court further found that since the 1898 decree, until just before this suit was commenced, there had been generally and usually delivered to the plaintiffs a quantity of water equal to .89 of a cubic foot per second of time; that defendant delivered such quantities of water in pursuance of an understanding and agreement on the part of the defendant and its predecessors in title; that such water so delivered was the amount of water to which plaintiffs were entitled under the 1898 decree; that plaintiffs accepted such quantities of water as the measure of their rights; that by such administration of the 1898 decree, and the mutual acceptance thereof by the parties, they had mutually placed a construction thereon and agreed to the same; that, by virtue of such agreed construction of the 1898 decree and their rights thereunder for many years, defendant had delivered and the plaintiffs had ac-

cepted said quantities of water generally and usually; that during all of said time the defendant had continuously represented to the plaintiffs by their acts in delivering said water, and by other acts, facts, and circumstances, that the said quantities of water so delivered were the quantities of water to which plaintiffs were entitled; that the plaintiffs relied upon such agreement as to the interpretation of the 1898 decree, and in reliance thereon plaintiffs resided upon, developed, and improved their lands and extended their areas of cultivation, and that, by reason thereof, the value of their lands for sale and taxation purposes became fixed, and taxes were paid on the basis of such valuations, and sales and loans were based thereon, and plaintiffs were induced to expend money in reference to their said lands, by virtue of such agreement as to the interpretation of said 1898 decree; that the defendant had full knowledge of such agreed interpretation of the 1898 decree, etc., and of the quantities of water delivered pursuant thereto, and knew that plaintiffs would be and were induced by such agreements, representations, and delivery of water to develop their lands and expend money thereon. The court found generally that defendant is estopped from denying that the plaintiffs are entitled to the quantity of water which had theretofore been so delivered to, received, used, and enjoyed by plaintiffs.

From these and other appropriate findings sustained by the evidence, the court decreed that the plaintiffs or the owners of water rights as described in plaintiffs' complaint, in an amount equal to .89 of a cubic foot per second of time, and additional amounts under certain conditions as set forth in the decree.

The record is a very voluminous one, but we have considered it all carefully, and are satisfied that the findings of the court are sustained by substantial evidence, and under uniform rulings would not be disturbed under such circumstances.

Appellant objects to the form of the findings on two grounds: (1) That such findings commingle findings of fact and conclusions of law; (2) as to some, that they

are not complete in themselves, but refer to the pleadings in a very indefinite manner.

As to the first objection, it may be said that it was decided in Fraser v. State Savings Bank, 18 N. M. 340, 137 P. 592, 594, that:

"Findings are not to be construed with the strictness of special pleadings. It is sufficient if, from them all, taken together with the pleadings, the court can see enough upon a fair construction to justify the judgment of the [trial] court, notwithstanding their want of precision and the occasional intermixture of matters of fact and conclusions of law."

While it is the better practice for the court to find conclusions of fact and law separately, failure to do so is not ground for reversal, unless appellant has been prejudiced thereby. See Monaghan Bay Co. v. Dickson, 39 S. C. 146, 17 S. E. 696, 39 Am. St. Rep. 704; 8 Standard Encyclopedia of Procedure, 1020. Appellant has not shown any prejudice resulting to it from the findings being objectionable as to form, if in fact they are so objectionable.

As to the second objection, we observe that the court found ultimate facts and referred in instances to the pleadings for greater particularity. We are not left in doubt as to what the findings of fact are, or concerning the ultimate facts upon which the judgment is based. This mode of finding facts by reference to the pleadings is not to be commended. It imposes greater labor in this court, both on counsel and court, but in view of what was said in Fraser v. State Savings Bank, supra, as to considering findings together with the pleadings, and the statement in 8 Standard Encyclopedia of Procedure, p. 1026, we do not consider the defect reversible error.

Another objection made by the appellant to the trial procedure is that the court erred in holding, finding, and decreeing that plaintiffs (appellants) were entitled to maintain this suit under the doctrine of virtual representation. Appellant invokes the holding in Snow v. Abalos, 18 N. M. 681, 140 P. 1044, that the individual water users under a community ditch are necessary and proper parties in an action for the adjudication of water rights, and that therefore the water rights owners cannot

be represented under the provisions of 4079 of the Code of 1915. That was a suit for the purpose of securing an adjudication of the rights of all water users taking water from the Rio Grande river below the Elephant Butte dam, etc., for the purpose of securing a judicial determination of the priority of all the existing rights to the use of water within the district involved. We do not think the doctrine there pronounced militates against the procedure authorized by section 4079 of the Code, where, as in the case at bar, the parties represented have a common interest with those before the court, and the interests of those actually before the court are not antagonistic to the interests of those represented. It is easy to perceive that all of the water users of the La Luz community ditch, both those named and those represented, had a common or general interest in the subject-matter of the suit, and that the purpose of the suit was not to determine water rights belonging to any particular plaintiff water user under said ditch. There was no issue raised as to the respective rights of such individual users as to the priority or amount of water claimed by them. The result of the lawsuit would affect all alike. The point is ruled against the appellant.

 The appellant also complains that the trial court erred in holding, finding, and decreeing that the complaint states but one cause of action. It claims that, because the complaint contained in one count allegations as to the contemporaneous construction of the decree of 1898, acquiescence, title by adverse possession, and by prescription, that it is obnoxious to the requirements of section 4105 of the Code, in that, among other things, the complaint presents a misjoinder of causes of action. It is noted that the defendant did not stand upon its demurrer, but answered over. The trial court found:

"The court further finds, as was declared to the court during the trial of said cause, by counsel for plaintiffs, that plaintiffs' second amended complaint was intended to state only one cause of action, and that all allegations of the complaint are intended to be pertinent thereto, except as to those allegations contained in paragraph 19 of plaintiffs' second amended complaint wherein and whereby the plaintiffs alleged in the alternative that if they are mistaken as to the amount of water which they are entitled to under the said decree of 1898, that then and in such event they

are entitled to the amount of water claimed by them under 20 years' limitation, which alternative allegations the court has not considered in making the foregoing findings, but finds that plaintiffs are entitled to judgment as hereinafter rendered upon the facts and findings hereinbefore and hereafter recited; and the court finds from the evidence that all facts required to prove said cause of action have been duly proved, and upon such single cause of action finds the issues generally for the plaintiffs."

Counsel for both parties now admit that the case was decided upon the ground of estoppel.

It would thus appear that the appellant is not prejudiced by the decision of the court overruling the demurrer, even if such decision were a technical error. In 4 C. J. Appeal and Error, § 2905, it is said:

"An error in sustaining or overruling a demurrer is harmless error where it appears that the substantial rights of the objecting party were not affected thereby."

See, also, Johnson v. Yelverton, 31 N. M. 568, 249 P. 99, where we said:

"Of course, if the defendant answers over and goes to trial after the overruling of his demurrer, and the cause is so submitted or decided that he is not prejudiced, there should be no reversal. Indeed, in such case, by answering over he waives the error in the overruling of his demurrer, and can thereafter complain only of later error, if any there be, in the submission of the issues or in the judgment."

So we find it unnecessary to enter into a discussion as to whether in fact the complaint did state more than one cause of action; the error of the trial court either having been waived or being harmless.

Aside from the procedural questions, the appellant urges several important objections to the decree which we will now consider. Appellant asserts that the decrees of 1898 and 1918 under the doctrine of res adjudicata and estoppel prevent readjudication and re-examination of the water rights here involved. Appellee disclaims that a readjudication was sought.

The trial court found as to the 1918 decree relied upon by appellant that the same is not binding upon plaintiffs in the present action as a former adjudication, because of a lack of privity thereto of plaintiffs, they not having been before the court in the cause resulting in the 1918

decree, and further because the issue presented in the present case is not identical with the issue presented and decided in the former case. And further, in effect, that the 1918 decree made no further or other definition of the quantity of water plaintiffs are entitled to than that contained in the 1898 decree, but made express reference to said 1898 decree, and that, after the 1918 decree, the parties to the present action have mutually treated said decree as not having been intended to make any change in the amount of water which defendant had for a long time previous thereto delivered to plaintiffs under their mutual interpretation of the 1898 decree, and that the defendant has continued the delivery of water to the plaintiffs in the same manner and quantities generally as it had done prior to the time of the rendition of said 1918 decree, and further found the facts generally against defendant upon its plea of res adjudicata, based upon said judgment of 1918.

It appears to us that plaintiffs and defendant each based their respective rights upon the decree of 1898 as its terms are interpreted by each, and that the trial court was correct in denying the plea of res adjudicata.

We also agree with the trial court in its finding and conclusion that the issues in the case at bar are not the issues decided in the action resulting in the decree of 1918. We think it would serve no good purpose to further discuss the plea of former adjudication.

The purpose of the present action was to secure an injunction against interference by defendant with the rights of the plaintiffs to the water and water rights they are entitled to according to the decree of 1898, as said decree should be interpreted by the court in the light of the record in the case in which the decree was entered, and the practical construction of such decree placed thereon by the parties by their acts, conduct, understandings, agreements, and representations, which interpretation of said decree and the amount delivered to plaintiffs thereunder paintiffs alleged the defendant is now estopped from denying. The question of contemporaneous construction of the decree of 1898 by the defendant and its predeces-

sors who were charged with the duty of administering the decree persisted in over a long period of time, and the acceptance of the quantity of water delivered to the plaintiffs and their predecessors and the question of estoppel presented by plaintiffs are interrelated, and are not separate causes of action.

A question of the sufficiency of the complaint to set forth facts sufficient to constitute a plea of estoppel was raised by demurrer to the complaint, but, the defendant not having stood on his demurrer, but having answered over, we will consider the question of estoppel in the light of the pleadings, proof, findings, conclusion, and decree of the court.

Upon the question of the construction of judgments, the rule is that, in cases of ambiguity or doubt, the entire record may be examined and considered. See 34 C. J. Judgments, § 794.

It is also said in the same text:

"A construction adopted or acquiesced in by the parties will not be changed without strong reason."

In addition to the cases cited in the text which we have examined and found in support thereof, we find the later case of Magnolia Petroleum Co. v. Caswell (Texas Court of Civil Appeals, 1927) 295 S. W. 653, which involved the construction of an agreed judgment (as in the case at bar), and wherein the court adopted and quoted the rule laid down in C. J. supra.

Appellant argues that, as the decree of 1898 is a judgment by consent, it is to be regarded as a contract between the parties, and must be construed as any other contract, quoting from 34 C. J. p. 133 to the effect that its operation and effect must be gathered from the terms used in the agreement, and should not be extended beyond the clear import of such terms, etc.

This does not help appellant, because, while the rule he cites is well recognized, there is another one equally well established to the effect that:

"If a contract is ambiguous in meaning, the practical construction put upon it by the parties thereto, is of great weight, even

though the contract is in writing, and ordinarily, is controlling, at least if such practical construction has lasted for a long period of time."

Page on the Law of Contracts, § 2034.

We are in accord with the rule thus stated as shown in State ex rel. De Burg v. Water Supply Co., 19 N. M. 36, 140 P. 1059, L. R. A. 1915A, 246, Ann. Cas. 1916E, 1290; Fraser v. State Savings Bank, 18 N. M. 340, 137 P. 592. See, also, the interesting case of Janesville Cotton Mills v. Ford, 82 Wis. 416, 52 N. W. 764, 17 L. R. A. 564. That case involved an interpretation of a clause in a deed conveying the use of a certain number of "square inches of water under a head of four feet, or its equivalent under any other head."

The court invoked the rule of practical construction placed by the parties in interest upon doubtful or ambiguous terms in a contract, and concluded:

"That the construction which the owners of the power for years placed upon the terms of their grants, it appearing that such construction is reasonable and definite, should and must prevail."

Appellant concedes that the decree of 1898 has been construed by a number of acts of both parties. It then refers to nine different efforts at construction as reflected by the different kinds of measuring and dividing devices used to deliver to the plaintiff and to their predecessors the amount they were entitled to under the decree. Appellant, however, objects that the quantity of water to be delivered to the plaintiff by the defendant who had charge of measuring and delivering devices, and whose duty it was to administer the provisions of the decree, is not a proper element or criterion of construction, because it asserts that there was never such uniformity in the delivery of water into the La Luz ditches as would amount to a definite construction of the amount that plaintiffs were entitled to receive.

The trouble with this argument is that the court found contrary to appellant's contention, in the face of appellant's requested finding to the effect that the amount of water which had been delivered to plaintiffs and their predecessors in interest, from the time of the decree of

1898, had not been uniform and constant, due to a variety of causes, which was refused.

We need go no further to support the judgment. The jurisdiction of the trial court was invoked to prevent the defendant from depriving plaintiffs of the amount of water they were entitled to under the decree of 1898 and to describe in definite terms what the amount of water plaintiffs were entitled to receive in well understood and statutory definition of measurement of water.

In order to decide the case, it was necessary for the trial court to know what the said decree of 1898 decided with respect to the amount of water the parties were entitled to. Finding said decree ambiguous, indefinite, and uncertain as to the definition of the quantity of water the plaintiffs and their predecessors were entitled to receive under the decree, the court properly considered the entire record in the case, and, finding it still uncertain and indefinite, the court properly admitted evidence as to the physical conditions under which the water was delivered, and also evidence as to the construction the interested parties had placed upon the decree. Expert evidence was adduced to the effect that in the period of 1892, under conditions then prevailing under irrigation projects similar to the one involved, the duty of water did not average over 50 acres per second foot. The court was authorized to consider that able counsel had participated in the proceedings, and that, when it was decreed that 54 acres of land should be entitled to "a permanent stream of 36 inches of water which shall perpetually run, day and night, through the two present community ditches, belonging to the said town of La Luz, which said quantity of water shall fill an opening or gate 6 inches in length and 3 inches in width through each of said ditches, making 18 square inches of water through each ditch," this amount was sufficient according to the then ideas as to the duty of water to irrigate without waste 54 acres of land. The court heard expert testimony to the effect that the measuring devices placed and operated in accordance with the provisions of the decree considered in the light of the stipulation, agreement of 1892, and the proceedings, did deliver approximately one second foot of water to said 54

acres of land. The trial court also had resort to the mutual contemporaneous construction by the parties of the decree, and found that, during a period of over 25 years prior to interference by defendant with the delivery of the water, an amount usually and generally had been delivered to plaintiffs and their predecessors equally .89 of a second foot. This, then, was the construction placed upon the decree of 1898 by the trial court, and is sufficient to sustain the judgment.

As the court, however, rested his judgment also upon estoppel, we will inquire into that question, though it is perhaps unnecessary for us to do so.

Questions relative to estoppel are not in general controlled by technical rules, but are usually determined upon principles of equity and good conscience. In King v. Stroup, 22 N. M. 241, 160 P. 367, after quoting a definition of the general doctrine of estoppel, we further quoted from 10 R. C. L. p. 689, as follows:

"Equitable estoppels operate as effectually as technical estoppels. They cannot in the nature of things be subjected to fixed and settled rules of universal application, * * * nor hampered by the narrow confines of a technical formula. So while the attempted definitions of such estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case. * * * The cases themselves must be looked to and applied by way of analogy, rather than rule."

The author then ventures the following summary of the rule:

"That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon."

It is well settled that:

"Where a person stands by and sees another about to commit or is in the course of committing an act infringing upon his rights, and fails to assert his title or right, he will be estopped afterwards to assert it."

21 C. J. Estoppel, § 155.

It is also a general rule that:

"One who, by his renunciation or disclaimer of a right or title,

has induced another to believe and act thereon, is estopped afterward to assert such right or title."

21 C. J. Estoppel, 153.

And it is said in the same text:

"And a representation as to the construction and effect of an instrument of obscure and doubtful character is equally good as an estoppel, if believed and acted upon, as is a disclaimer of title to a person about to purchase."

Appellant claims that it is not shown in the case at bar that defendant knew that it was delivering to the plaintiffs more water than they were entitled to. Thereby he seeks to invoke the rule that knowledge as to the material facts represented is indispensable to the application of the doctrine of equitable estoppel. We cannot doubt that the defendant knew the facts as to how much water it was delivering to the plaintiffs and their predecessors. If the defendant made the discovery a little while before this suit was commenced in 1923 that the construction theretofore placed upon the decree of 1898 was erroneous, and that by virtue of said decree plaintiffs were entitled to a less quantity of water than had been actually theretofore delivered, this sort of mistake as to the defendant's rights would not relieve from the effect of the estoppel urged by plaintiffs. In 21 C. J. Estoppel, § 228, it is said that:

"No estoppel arises where the representation or conduct of the party sought to be estopped is due to ignorance founded upon an innocent mistake."

The writer says, however, that there is authority to the contrary, citing Rogers v. Portland, etc., R. Co., 100 Me. 86, 70 A. 713, 70 L. R. A. 574; King v. Stroup, 22 N. M. 241, 160 P. 367, and Tilton v. Nelson, 27 Barb. (N. Y.) 595. The last-mentioned case is cited by the court in Mattoon v. Young, 2 Hun (N. Y.) 559, in answer to a contention like the one made by appellant here, saying:

"Admit that John did not intend to deceive Willard, and it is quite manifest that all the parties were under misapprehension as to the legal import of the instrument. Sherwin, who was present at the interview between John and Willard, swears that he had never heard of any claim by John or his heirs. John asserted that he had none, except such as would terminate on his decease; and further assured Willard that if he should make the purchase, he would obtain good title; and Willard then made the purchase and paid the full value of the property. But if all were under

mistake, that fact would not relieve the case from the effect of the estoppel here urged."

Judge Miller dissented, but agreed that:

"It does not impair the effect of the estoppel, because Mattoon was mistaken as to the import of the instrument."

So in King v. Stroup, while admitting that there were cases holding to the contrary, we decided that (syllabus):

"Where one's conduct has led another to take a position detrimental to his interest, the former will not be heard to say that he is not estopped because of his ignorance of his legal rights in the first instance, provided he has full knowledge of the facts."

See, also, Bramwell v. Rowland (1927) 123 Or. 33, 261 P. 57.

Appellant also argues that the authorities point out that the truth concerning the facts must be unknown to the other party claiming the benefit of the estoppel at the time the acts were committed and at the time the implied representations were acted upon. If the defendant and its predecessors, charged with the duty of making delivery of the water, had not discovered until after 25 years that more water was being delivered to the plaintiffs than the decree called for (if such were the case), it is difficult to conceive of how a better understanding and knowledge could be imputed to the plaintiffs.

Corpus Juris (note) says the reason for the view taken in Maine, New York, and New Mexico is that:

"The presumption is that every person is acquainted with his own rights, provided he has had reasonable opportunity to know them; and nothing can be more liable to abuse than to permit a person to reclaim property in opposition to all the equitable circumstances stated, upon the mere pretense that he was at the time ignorant of his title."

The doctrine that ignorance or mistake will not invariably defeat an estoppel seems to be in accord with the doctrine announced in Bank of Hatch v. Mossman, 25 N. M. 547, 185 P. 275, that:

"When one of two innocent parties must suffer, the one who made the conditions possible should bear the loss."

In addition to the foregoing, it would seem that the defendant was chargeable with the better means of infor-

mation and knoweldge as to the amount of water delivered or to be delivered, because the duty devolved upon it and its predecessors to administer and to make delivery of the water by means of instrumentalities under its control, which duty it assumed and exercised during the time since the decree of 1898, and the plaintiffs acquiesced in the amount of water so delivered.

Appellant quotes authority to the effect that estoppel will not arise from merely receiving water that another discharges. This is conceded by appellees, but they say that more than that has been shown in this case. The court found more in its findings. Appellee thus summarizes some of the facts showing that defendant must have intended and anticipated that water users in La Luz would act upon and be influenced by its representations:

"(a) Water was valuable, and delivery to La Luz ditch, of water which Alamogordo was entitled would have been derogatory of Alamogordo's rights and interest.

"(b) Alamogordo required and could have used more water, and La Luz users had right to believe they would take it and use it if it belonged to them.

"(c) All parties are presumed to know that the law would work a forfeiture if Alamogordo failed to beneficially use the water it claimed to own.

"(d) Alamogordo owed duty to carry amount of water belonging to La Luz, and the latter had right to presume that duty would be discharged.

"(e) Alamogordo knew of the character of development going on in La Luz and knew that such development was being made and property values were being established, and that property was being used in reliance upon the water supply which had been and was being delivered to La Luz through the active agency of Alamogordo."

Appellant argues that the mere delivery of water could not be held to be a representation. This is a too narrow view. We think it is what is referred to in the books as an "implied representation."

Acquiescence in use, obstruction, or diversion of water is one of the recognized grounds of estoppel. Kinney on Irrigation and Water Rights (2d Ed.) § 1127, after showing that something more than mere passivity on the part

of the person sought to be estopped is generally necessary to create the estoppel, goes on to say:

"But, upon the other hand, the circumstances may be such that it is the duty of one, where he sees his rights about to be invaded by another to speak out and lay claim to the same; otherwise he will be estopped from afterward setting them up and claiming them. Such was held to be the case where one who had a prior right by prior appropriation to the use of water of a certain stream stood by and allowed another wrongfully claiming to own the right to sell it to a third party, without asserting and making known his claim. By reason of his failing to speak when he should have spoken, he was estopped from thereafterward asserting or claiming the right. 'It is elementary that he who fails to assert his alleged rights, when in good faith he should have done so, is estopped from afterward asserting the same.' As was said in a recent Colorado case: 'He that remains silent when conscience requires him to speak shall not be heard to speak when conscience requires him to remain silent.'

"Again, where the evidence is conclusive that the owner, knowing that his rights were about to be invaded by another, stood by and permitted the other parties to construct expensive works, use, and enjoy the rights, and by his actions assented and invited such works and use, although he did not do so in terms, but by his very silence, he induces them to believe that such rights might be acquired, that thereafterward to deprive them of such rights would work an injustice and fraud upon them, such owner will be held to be estopped from setting up or claiming such rights."

See, also, Halford Ditch Co. v. Independent Ditch Co., 22 N. M. 169, 159 P. 860. Additional cases supporting this doctrine may be found in Decennial Digests, Estoppel, Key 93 (7).

In a case note in Vol. 2, Ann. Cas. P. 786, the author says:

"Injunctive relief has also been denied in cases where the diversion and use were by individuals or private corporations, on grounds of equitable estoppel and laches arising out of the consent or tacit acquiescence of the plaintiff in the erection of expensive improvements, by which the diversion was caused or for the operation of which the water was necessary; such as canals, dams, irrigation ditches, mills and railroads."

Many cases are cited, including Waddingham v. Robledo, 6 N. M. 347, 28 P. 663.

Appellant urges that, in order to create estoppel, there must be a degree of moral turpitude involved. This is another way of saying that there can be no estoppel without fraud. But, conceding this to be the law, still it is fraud to deny that which has been previously affirmed.

See Pritchett v. Ahrens, 26 Ind. App. 56, 59 N. E. 42, 84 Am. St. Rep. 274. The entire argument of appellant as to why estoppel should not be applied in this case, although able and exhaustive, does not convince us. Without attempting to answer such argument further than we have done, it is sufficient to say that, under the facts and circumstances as shown in this case, we agree with the trial court that it would be inequitable to permit appellant to now change its former position to the detriment of appellees. Other contentions of appellant not here discussed we deem without merit.

The judgment of the trial court will therefore be affirmed, and it is so ordered.

WATSON and PARKER, JJ., concur.

SIMMS and CATRON, JJ., not participating.